**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DARYL M. ECKSTEIN,         )
                                      )
         Plaintiff,      )
                                      )     Civil Action No. 13-1111
         v.            )
                                      )     Judge Nora Barry Fischer
CAROLYN W. COLVIN,      )
*Commissioner of Social Security*,    )
                                      )
        Defendant.     )

## MEMORANDUM OPINION

## I. INTRODUCTION

Daryl M. Eckstein ("Plaintiff") brings this action under 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–433 ("the Act"). (Docket No. 1). This matter comes before the Court on cross motions for summary judgment. (Docket Nos. 10, 12). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment [10] is denied, and Defendant's Motion for Summary Judgment [12] is granted.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on December 8, 2009, and for Supplemental Security Income ("SSI") on December 14, 2009, claiming a disability onset of June 9, 2009. (R. at 111–19).[1] His SSI claim was denied on December 21, 2009 because he was ineligible based on his income, (R.

---

[1] Citations to Doc. No. 4-1 through 4-20 are hereinafter referred to as "R. at _____."

at 65–72), and his DIB claim was then denied on June 17, 2010, (R. at 63–64). Plaintiff requested an administrative hearing as to the DIB determination. (R. at 75, 77–80). This hearing was conducted on August 10, 2011 in Pittsburgh, Pennsylvania, at which Plaintiff, represented by Elizabeth A. Smith, and Patricia J. Murphy, an impartial vocational expert, testified. (R. at 18).

On September 14, 2011, the Administrative Law Judge (ALJ) issued his ruling, which was unfavorable to Plaintiff. (*Id.*). On October 6, 2011, Plaintiff appealed the ALJ's decision regarding DIB to the Appeals Council. (R. at 12–14). Plaintiff's attorney also submitted a letter to the Appeals Council, dated March 28, 2012, arguing that the ALJ's decision should be reversed and the Council should award Plaintiff benefits, or alternatively, should remand the case. (R. at 270–73). On June 3, 2013, the Appeals Council denied Plaintiff's request for review, thereby making the decision of the ALJ the Commissioner's final decision. (R. at 1). Plaintiff filed his Complaint on July 31, 2013. (Docket No. 1). Defendant filed her Answer on October 1, 2013. (Docket No. 2). The parties then filed cross-Motions for Summary Judgment. (Docket Nos. 10; 12). Plaintiff also filed a Concise Statement of Material Facts. (Docket No. 7). The matter having been fully briefed, (Docket Nos. 11; 13; 15), is now ripe for disposition.

## III.   STATEMENT OF FACTS

### A.      General Background

Plaintiff was born on December 3, 1963 and was forty-seven years old at the time of his administrative hearing. (R. at 111). He has been married since 1987 and has two children. (R. at 111–12, 620). As of December 2009, Plaintiff's income included Social Security and $624 monthly in "sick pay" from Met Life and Traco. (R. at 116). Plaintiff's wife is employed by HP Starr and earned $2,666 monthly. (R. at 117).

Plaintiff received his high school diploma and completed vocationAL training for heavy equipment repair. (R. at 149). From 1984 until June 9, 2009, he worked at a company called Traco, which manufactures windows. (R. at 144, 621). Plaintiff performed a variety of jobs during his time at Traco. Most recently, he worked as a line leader, which job entailed passing out orders for jobs, making sure that materials and tools were ready, keeping the line moving, and performing quality inspections. (R. at 144). He supervised approximately eight other people. (R. at 145). In the past, he worked in quality control for over six years. (R. at 620).

Plaintiff, however, began developing depression and anxiety in 2009, which conditions hindered his job performance. (*Id.*). For example, Plaintiff started to experience symptoms of panic attacks during his commute to work and during the workday. (*Id.*). He consequently went on medical leave under the Family Medical Leave Act; in June 2009, he was placed on short-term disability. (*Id.*).

In his application for DIB, Plaintiff claimed that he has been unable to work since June 9, 2009 due to depression and anxiety. (R. at 143). He explained that his depression interfered with his concentration and caused low self-esteem. (*Id.*). Additionally, stress caused him to feel nervous and sometimes to experience panic attacks. (*Id.*). In his Self-Report, Plaintiff described his daily activities as including taking his medication; eating breakfast; cleaning up; researching jobs on the internet; taking care of his dogs; eating lunch; watching television or napping; cooking supper; cleaning up; going out with his wife, if the couple needed to spend time together; and then going to bed. (R. at 152). Plaintiff reported that his illness interfered with his sleep because at times he wakes up experiencing a panic attack. (R. at 153). He denied problems with personal care. (R. at 153–54). He prepared his own meals, including "sandwiches [and] complete meals" on a daily basis, although at times his illness caused him to not feel like

cooking or eating. (R. at 154). Plaintiff also performed house and yard work such as cleaning and doing repairs, for which he required no help or encouragement. (*Id.*). Plaintiff was able to go outside and get around "quite often," and drove a car. (R. at 155). He often went out alone, although he preferred to have family with him because he was afraid of experiencing panic attacks. (*Id.*). With respect to hobbies and social activities, Plaintiff generally played computer games, watched television, walked his dogs, and drew, depending on his mood. (R. at 156, 159). He described experiencing panic attacks that depleted his energy, and that his depression interfered with his ability to think. (R. at 157, 159).

**B.     Mental Health Treatment**

As a child, Plaintiff experienced some depression after he witnessed his mother pass away from a blood clot that travelled to her lungs. (R. at 619). Plaintiff was ten or eleven years old at the time. (*Id.*). Since then, Plaintiff has occasionally gone through depressive periods throughout his life, which have lasted up to a month at a time. (R. at 619–20). During said periods, Plaintiff's symptoms included feeling sad, isolation, guilt, lack of motivation and interest, and not gaining pleasure from activities. (R. at 620). He has never been psychiatrically hospitalized. (*Id.*).

1.     Dr. Fiorina

Plaintiff claimed a disability onset date of June 9, 2009. (R. at 143). He treated with Dr. Michael Fiorina of Fiorina–Wall Family Practice on several occasions during 2009 and 2010. (R. at 274–80). On January 22, 2009, Plaintiff complained of chest palpitations and shortness of breath, which were determined to be signs of panic attacks. (R. at 279). These symptoms were generally worse at night. (*Id.*). Plaintiff occasionally suffered attacks at work, rendering him unable to perform his duties. (*Id.*). Dr. Fiorina ordered a cardiology stress test, remarking that if

said test was negative, he would consider changing Plaintiff's medications, which included Celexa[2] and Xanax.[3] (R. at 280). Plaintiff followed up with Dr. Fiorina on February 11, 2009, and continued complaining of panic attacks, reporting that they occurred at night, and only on weekdays. (R. at 275). Dr. Fiorina noted that Plaintiff's stress test showed normal results. (R. at 275, 281–86). On May 11, 2009, Dr. Fiorina again noted that Plaintiff's panic attacks occurred while he was asleep, and that his therapist had told him the attacks were work-related. (R. at 275, 616). During their multiple visits, Dr. Fiorina recorded that Plaintiff had no side effects from his medications, which included Klonopin[4] and Celexa. Dr. Fiorina increased Plaintiff's dosage of Klonopin and directed him to follow-up with therapist Dr. Drolet. (R. at 276, 617).

### 2.    Dr. Drolet

Plaintiff began seeing Dr. Susan Drolet, a Psychologist at Wellness Works, on May 15, 2009. (R. at 560). In her initial evaluation, Dr. Drolet assessed that Plaintiff was depressed and displayed poor judgment, attention, and memory. (R. at 565). His thoughts were clear and his speech was good. (*Id.*). At this appointment, Plaintiff completed a Beck Anxiety Inventory,[5] wherein he marked that he had been moderately or severely bothered by most of the listed

---

[2] Citalopram (Celexa) is a selective serotonin reuptake inhibitor, which treats depression by increasing the activity of serotonin in the brain. *Citalopram*, PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009639/ (last visited Mar. 18, 2014).

[3] Alprazolam (Xanax) is a benzodiazepine that is used to treat anxiety, including anxiety caused by depression, as well as panic disorder. *Alprazolam*, PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0008896/ (last visited Mar. 18, 2014).

[4] Clonazepam (Klonopin) is a benzodiazepine medication used for the treatment of seizures, panic disorder, and anxiety. PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009677/ (last visited Mar. 18, 2014).

[5] "The BAI is a 21-item self-report questionnaire that assesses anxiety severity. It was specifically designed to reduce the overlap between depression and anxiety scales by measuring anxiety symptoms shared minimally with those of depression. Both physiological and cognitive components of anxiety are addressed in this scale." *Beck Scales and Inventories*, UNIV. OF PA. DEP'T OF PSYCHIATRY, available at https://www.med.upenn.edu/suicide/beck/scales.html (last visited Mar. 13, 2014).

symptoms during the past week, with a total score of forty-two. (R. at 567). In another questionnaire relating to symptoms of depression,[6] Plaintiff scored twenty-three. (R. at 568–69). Based on her assessment, Dr. Drolet diagnosed Plaintiff with Major Depressive Disorder,[7] "severe" occupational problems, and opined that Plaintiff's Global Assessment of Functioning[8] score equaled 45. (R. at 565).

Following this assessment, Plaintiff began meeting with Dr. Drolet for weekly therapy sessions. (R. at 570–606, 611–15, 633–34). Dr. Drolet's records from these sessions include a check-the-box form, on which she rated Plaintiff's depression and anxiety. (*Id.*). Dr. Drolet also summarized these ratings in a chart. (R. at 630–32). From October 1, 2010 through July 28, 2011, Dr. Drolet marked Plaintiff's depression as "moderate" and anxiety as "severe" on the majority of the visits. (*Id.*).

In addition to rating Plaintiff's anxiety and depression, she handwrote notes regarding each session. (R. at 570–606, 611–15, 633–34). These notes are mostly brief, not in sentence form, and seem to reflect certain topics discussed in Plaintiff's therapy, rather than detail his current state. (*Id.*). Many of Dr. Drolet's notes speak to Plaintiff's mental health status and

---

[6] This questionnaire is not titled in the Record. (R. at 568–69). The Court notes, however, that the form appears to be the Beck Depression Assessment Questionnaire, which "is a 21 item self-report questionnaire that assesses severity of depression. This instrument is one of the most widely-used assessment measures in both research and clinical settings." *Beck Scales and Inventories*, *supra* note 5.

[7] Major Depression "is a mood disorder in which feelings of sadness, loss, anger, or frustration interfere with daily life for weeks or longer." *Major Depression*, NAT'L INST. HEALTH, available at http://www.nlm.nih.gov/medlineplus/ency/article/000945.htm (last visited Mar. 19, 2014).

[8] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 41–50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

indicate ongoing anxiety and depressive symptoms. (R. at 570–606, 611–15, 633–34). For example, on May 5, 2011, Dr. Drolet reported that Plaintiff's anxiety symptoms have been "debilitating for several days." (R. at 576). Plaintiff's mood sometimes fluctuated during the day. (R. at 633). Plaintiff reported ongoing issues with anxiety and depression, as well as feeling like his thinking was "off." (R. at 573, 574, 582). He had difficulty especially in crowds of people. (R. at 585). Plaintiff additionally was experiencing a number of social stressors other than his mental ilness, such as his father passing away around April 2011 and various issues within his immediate family. (R. at 575–80, 596–98, 601). Plaintiff worked on integrating skills learned in therapy, such as self-talk, meditation, exercise, as well as his as-needed medication, to control his symptoms. (R. at 571, 585, 586, 590, 592).

Dr. Drolet's notes provide some evidence as to Plaintiff's daily activities. (R. at 570–606, 611–15, 633–34). To this end, although Plaintiff continued experiencing psychiatric symptoms, he engaged in various activities, such as working on his motorcycle, running errands for his family, going out with his family, and occasionally socializing with friends. (R. at 578, 593, 602–605). Similarly, Dr. Drolet worked with Plaintiff on trying to "keep busy**."** (R. at 571, 575, 600). For example, on January 14, 2011, she gave Plaintiff a homework assignment to create a list of things with which to fill his day. (R. at 592).

Dr. Drolet frequently references discussions about Plaintiff returning to work. (R. at 570–606, 611–15, 633–34). Plaintiff complained of a "fear of having to call off," and being "unable to function for [a] sustained period." (R. at 576). In spite of these concerns, Plaintiff talked about his active efforts to decide the industry in which he would like to work, (R. at 586, 606), applying to various jobs, (R. at 576, 585, 587, 594, 598, 600, 602, 604), going on job interviews (R. at 580, 589, 590, 591), and possibly get more education to advance his career prospects, (R.

7

at 573, 584, 603). Dr. Drolet reported on March 2, 2011 that Plaintiff was focusing on finding a job where the stress level would be low. (R. at 585).

### 3. Dr. Matta

At the same time that Plaintiff saw Dr. Drolet for weekly therapy sessions, he also met with Dr. Mark A. Matta, D.O. for medication management every few months, beginning on June 12, 2009. (R. at 287–91, 607–10). In his Evaluation note, Dr. Matta reported that Plaintiff began to have panic attacks in 2009, although his depression had started toward the end of 2008. (R. at 289). He was taking time off work because he felt drained after experiencing panic attacks. (*Id.*). Dr. Matta increased Plaintiff's Celexa dosage, discontinued Klonopin, and prescribed Plaintiff Ativan.[9] (R. at 291).

Dr. Matta next saw Plaintiff on August 7, 2009. (R. at 288). At this visit, Plaintiff reported "some overall improvement" with his symptoms. (*Id.*). Dr. Matta observed Plaintiff to appear less anxious. (*Id.*). He increased Plaintiff's Celexa and Ativan prescriptions. (*Id.*).

Over the course of Plaintiff's next three visits with Dr. Matta, on November 12, 2009, February 12, 2010, and May 6, 2010, Dr. Matta consistently noted that Plaintiff denied side effects from his medications. (R. at 287, 609–10). Plaintiff continued experiencing anxiety, although Dr. Matta's notes indicate that the overall anxiety level was decreasing. (*Id.*). As a result, Dr. Matta made no changes to Plaintiff's medication regimen during these appointments. (*Id.*). At their July 24, 2010 appointment, Plaintiff described his mood as "good" and further reported that his panic attacks were less frequent and of decreasing intensity. (R. at 610). Again,

---

[9] Lorazepam (Ativan) is a prescription drug used for treating anxiety, anxiety with depression, and insomnia (trouble sleeping). This medicine is a benzodiazepine. *Lorazepam*, NAT'L LIB. MED., *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0001078/ (last visited Mar. 18, 2014).

Dr. Matta continued Plaintiff on his current medications, recording that Plaintiff experienced no side effects. (*Id.*).

Similarly, on March 3, 2011, Plaintiff was compliant with his medications and denied side effects. (R. at 609). Dr. Matta noted that Plaintiff was "job hunting" and frustrated with respect to same. (*Id.*). His affect was cooperative and pleasant. (*Id.*). No changes were made to Plaintiff's medications. (*Id.*). Plaintiff saw Dr. Matta for another medication check on June 9, 2011. (R. at 608). Plaintiff again denied side effects and reported mostly normal appetite and sleep. (*Id.*). He described his mood as "good," but reported ongoing anxiety, "particularly[,] problems with crowds." (*Id.*). On this note, Plaintiff felt claustrophobic when going to crowded places, such as church or shopping. (*Id.*). Dr. Matta decreased Plaintiff's Ativan, and otherwise continued his medications. (*Id.*).

As of July 22, 2011, at which time Plaintiff supplied a "Claimant's Medications" form for Social Security, he was prescribed Celexa, Ativan, and Klonopin. (R. at 269). He noted that he took Ativan at bedtime to treat his panic attacks, and Klonopin for anxiety during the day. (*Id.*). Additionally, Plaintiff stated that he experiences some side effects, including that Klonopin caused him to "feel kind of out of it" and slowed his thinking, and that Ativan made him feel tired. (*Id.*).

### C.    Statements from Plaintiff and His Wife

#### 1.    Plaintiff's Journal

The record includes several hundred pages of journal entries, written by Plaintiff, dated from July 13, 2010 through May 31, 2011. (R. at 170–264, 321–559). In summary, these daily journal entries are each about several sentences long. (*Id.*). Plaintiff described each day in general terms, such as "an ok day," "a better day for me," "a so-so day," or "a bad day." (R. at

192, 195, 237, 248). Then, Plaintiff wrote a short summary of his thoughts or things he had done that day. (*Id.*).

As the parties have both detailed in their filings, (Docket No. 7 at 5–10; Docket No. 11-1; Docket No. 13 at 10–11), these journal entries contain voluminous statements by Plaintiff speaking both to his ongoing mental health symptoms and also to his daily activities. To this end, Plaintiff's journal shows his ongoing complaints of panic attacks (R. at 180, 323, 326, 343, 359, 363, 376, 400, 437, 468, 512, 519, 551); low mood, (R. at 186, 219, 220, 324, 338, 374, 393, 444, 458, 482, 504, 554, 559); poor energy, (R. at 329, 344, 346, 351, 356,480, 502); and anxiety, (R. at 326, 334, 342, 409, 530).

With respect to Plaintiff's functioning, his journal entries record Plaintiff going shopping, sometimes with family, (R. at 174, 177, 180, 182, 184, 196, 205, 211, 234, 248, 255, 263, 322, 333, 334, 462, 485); eating out with family, (R. 173, 187, 189, 224, 230, 239, 249, 259, 327, 332); performing household chores, (R. at 181, 188, 198, 199, 200, 204, 209, 212, 221, 223, 225, 232, 240, 241, 248, 250, 252, 258, 260, 264); socializing with family (R. at 188–90, 196, 217, 220, 222, 225, 228, 237, 239, 240, 247, 253, 331); getting exercise by walking around a shopping mall, (R. at 179, 199, 208); and working on automobiles and/or riding his motorcycle, (R. at 203, 208, 221–23, 227, 230, 237, 241, 243–45, 250, 252, 254, 255, 258–59, 261, 263, 264, 528).

### 2.    Statement of Plaintiff's Wife

Plaintiff's wife, Debra Eckstein, submitted a notarized letter, dated June 21, 2011, describing her perceptions of how Plaintiff has changed in the past few years. (R. at 265–68). Mrs. Eckstein wrote that she has been married to Plaintiff for twenty-four years. (R. at 266). He "has suffered with depression for a number of years, but now it is more frequent," and Plaintiff

"also suffers from anxiety attacks." (*Id.*). When Plaintiff first began experiencing panic attacks, Mrs. Eckstein thought he might have a heart condition, in that Plaintiff had difficulty breathing and talking, and he felt like he had one hundred pounds of weight on his chest. (*Id.*). Later, they learned that anxiety was causing these episodes. (*Id.*). Mrs. Eckstein wrote that she sometimes needed to pick Plaintiff up from work because of these attacks, noting that Plaintiff never left work early for health reasons before his anxiety began. (*Id.*). Mrs. Eckstein further described that after Plaintiff has an anxiety attack, he is wiped out, sleeping for hours, and is unable to do anything the rest of the day. (*Id.*).

Mrs. Eckstein discussed how Plaintiff had become "claustrophobic around crowds." (*Id.*). For example, at church, Plaintiff went into a small room, which had the service shown by television, as soon as the church became crowded. (*Id.*). Similarly, when the couple went shopping, Plaintiff sometimes had anxiety attacks if the store was busy. (R. at 267). Again, this represented a marked change from how Plaintiff functioned during most of their marriage. (*Id.*). In the past, the family went out frequently, going camping or going out for a drive. (*Id.*). However, the family's routines were changing, in that their activities depended on "how [Plaintiff] is feeling. If his depression is bad, he doesn't have the desire to go and he is afraid he will have an anxiety attack." (*Id.*).

Mrs. Eckstein similarly stated that many times when she came home from work, Plaintiff told her that he had planned to go out that day, but did not follow through. (*Id.*). If Mrs. Eckstein asked Plaintiff to do multiple things—such as sweep and do the laundry—Plaintiff grew nervous, telling her that in his mind, he felt as though he needed to complete the chores within a short period of time. (*Id.*). Before Plaintiff's depression deepened and his anxiety attacks began, she

never had reason to worry about Plaintiff accomplishing tasks or being in crowds of people. (R. at 267–68).

### D.    Functional Capacity Assessments

#### 1.    Dr. Houk's October 2009 Psychological Evaluation

In October 2009, Dr. Suzanne Houk, Ph.D. performed a comprehensive psychological evaluation of Plaintiff, upon referral by the Office of Vocational Rehabilitation, in order to determine his "vocational potential and diagnosis." (R. at 619–29). After reviewing Plaintiff's psychiatric history, Dr. Houk noted that Plaintiff was engaged in treatment with Dr. Drolet and Dr. Matta, and that he reported noticing improvements from this treatment. (R. at 620). Specifically, Plaintiff described better self-esteem and that "the depression hasn't kept me down a lot," although Plaintiff continued to feel anxiety regarding whether he would be able to return to work. (*Id.*). Plaintiff described his mood as "terrible," with "lots of ups and downs, even within an hour." (*Id.*). Plaintiff expressed having little interest in social activities. (*Id.*). Dr. Hout noted that his appetite had improved in recent months. (*Id.*). Plaintiff continued experiencing panic attacks and other anxiety symptoms, often feeling "on edge." (R. at 621). However, Plaintiff's racing thoughts had "slowed down somewhat since taking medicine." (*Id.*).

During the course of her evaluation, Dr. Houk perceived Plaintiff to appear anxious. (*Id.*). He was talkative and demonstrated good social skills. (*Id.*). Plaintiff was able to handle most tasks in an efficient manner and seemed to give full effort. (R. at 622). When tasks required a higher level of sustained concentration, Plaintiff seemed hesitant, which Dr. Houk attributed to "a degree of self-doubt and difficulty regulating the amount of effort required by tasks." (*Id.*).

Based on the battery of tests administered, Dr. Houk concluded that Plaintiff's overall intellectual ability is average, with strengths in auditory closure and visual–spatial thinking, and

relative weaknesses in attentional capacity, divided attention, and perceptual speed. (R. at 626).

Additionally, Plaintiff demonstrated significant psychological distress, including anxiety and

depression. (*Id.*). Dr. Houk opined that Plaintiff has "modest vocational potential with highest

profiled ability in the outdoor career cluster, with highest interest in processional service." (*Id.*).

Overall, Dr. Houk recommended continuing counseling and medication management, vocational

counseling to incorporate Plaintiff's abilities and interests, as well as the use of assistive devices

(such as a calculator) for training and work purposes. (*Id.*).

### 2.     Dr. Drolet's April 2, 2010 Provider Source Statement

Dr. Drolet completed a Source Statement on April 2, 2010. (R. at 292–94). Therein, she

opined that Plaintiff had slight restrictions with respect to: understanding, remembering, and

carrying out short, simple instructions; moderate restrictions with interacting appropriately with

the public; marked limitations in interacting appropriately with supervisors and co-workers;

extreme limitations in responding appropriately to work pressures and/or changes in a usual

work setting; severe deficits in attention and concentration; and was further unable to

consistently perform due to an "inability to perform simple job tasks / people interaction." (R. at

293–94). Dr. Drolet's assessment was based on observation, Beck Anxiety Inventory, Beck

Depression Inventory, and reports from Plaintiff and his family. (R. at 294).

### 3.     Dr. Drolet's July 10, 2011 Medical Source Statement

On July 10, 2011, Dr. Drolet completed a second Source Statement. (R. at 611–15). She

completed a check-the-box form, making some additional handwritten comments in the margins,

(*Id.*). She identified Plaintiff's signs and symptoms to include: periodic poor memory;

suppressed appetite during times of high stress; personality changes including increased

irritability; emotional lability; severe recurrent panic attacks at night and in groups of people;

anhedonia or pervasive loss of interests; psychomotor agitation or retardation; feelings of guilt/worthlessness; difficulty in thinking or concentrating; suicidal ideation or attempts; oddities of thought, perception, speech, or behavior, including "mentally 'somewhere else;'" social withdrawal or isolation several times a week; illogical thinking or loosening of associations; decreased energy; obsessions or compulsions; intrusive recollections of a traumatic experience; persistent irrational fears; generalized persistent anxiety; somatization unexplained by organic disturbance, including "headaches post panic attacks;" periodic hostility and irritability; and pathological dependence or passivity. (R. at 612).

In addition to those check-the-box findings, Dr. Drolet wrote that her clinical findings regarding Plaintiff's mental state showed that he was fully oriented; this thoughts were obsessive, but without psychosis; he experienced moderate problems with attention and concentration; mild to moderate problems with short-term memory and recall; his judgment was fair; and his mood was moderately to severely depressed. (R. at 613). Dr. Drolet further indicated that Plaintiff experiences a side effect from medication, including that Ativan makes him feel drowsy. (*Id.*). She opined that Plaintiff's prognosis is "fair–poor," and that Plaintiff's impairment can be expected to last at least twelve months. (*Id.*). With respect to work, Dr. Drolet averred that Plaintiff's impairments would cause him to be absent from work more than three times per month. (*Id.*).

Regarding Plaintiff's ability to perform work-related activities on a day-to-day basis in a regular work setting, Dr. Drolet completed another check-the-box form, noting that Plaintiff has good abilities to: understand and remember very short and simple instructions; understand and remember detailed instructions; and adhere to basic standards or neatness and cleanliness. (R. at 613–15). Plaintiff has fair abilities to: remember work-like procedure; work in coordination with

or proximity to others without being unduly distracted; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; be aware of normal hazards and take appropriate cautions; maintain socially appropriate behavior; and travel in unfamiliar places. (R. at 614–15). Plaintiff has poor abilities to: maintain regular attendance and be punctual within customary, usually strict tolerances; and respond appropriately to changes in a routine work setting. (R. at 614). Depending on the day, the number of employees, and the situation, Plaintiff has good to poor abilities to: carry out very short and simple instructions; and sustain an ordinary routine without special supervision. (*Id.*). Similarly, depending on the day, the number of employees, and the situation, Plaintiff has fair to poor abilities to: maintain attention for a two-hour segment; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them; deal with normal work stress; carry out detailed instructions; set realistic goals or make plans independently of others; deal with stress of semiskilled or skilled work; and interact appropriately with the general public. (R. at 614–15).

Dr. Drolet opined that Plaintiff has no physical limitations affecting his ability to work. (R. at 615). She assigned Plaintiff's current GAF score as 43, noting that this is the highest GAF score in the past year. (*Id.*). Finally, Dr. Drolet stated that she based her conclusions in this Report on her office records, mental status examination, and clinical therapy notes. (*Id.*).

4.    Dr. Uran's May 26, 2010 Consultative Examination Report

Dr. Julie Uran, Ph.D. conducted a Clinical Psychological Disability Evaluation on May 26, 2010, for which she interviewed Plaintiff. (R. at 295–302). Dr. Uran reviewed Plaintiff's

background, including his educational and work history, commenting that he is looking for work with an auto body company. (R. at 295). However, Dr. Uran further noted that Plaintiff "feels he would have difficulty sustaining a job because of depression," and specifically that Plaintiff's mood varies between days. (*Id.*). Plaintiff reported that his mental health had generally improved. (*Id.*). He continued experiencing anxiety, however, which "is contingent upon his situation. Symptoms manifest in large groups and cause a feeling of the need to flee if there are limited points of egress." (R. at 296). Plaintiff rated his current emotional status as "fair bordering on good . . . my medicine and counseling are helping . . . my attacks still aren't under control." (*Id.*).

Dr. Uran observed that Plaintiff drove to their appointment and was unaccompanied. (*Id.*). He was dressed appropriately, had good hygiene, established eye contact, and was cooperative with her interview. (*Id.*). His speech was coherent and spontaneous, his mood and affect were situationally appropriate, and his thought process was clear. (*Id.*). Plaintiff showed some signs of low self-esteem and worthlessness, as well as guilt. (R. at 297). She opined that Plaintiff demonstrated no problems with impulse control, had appropriate social judgment, and had good capacity to gain insight and learn from experience. (*Id.*). Dr. Uran diagnosed Plaintiff with Major Depression, recurrent; Panic Disorder without Agoraphobia; Post-traumatic Stress Disorder; and assigned a GAF score of 55. (*Id.*).

Based on her evaluation, Dr. Uran assessed that Plaintiff's functioning is limited as follows: no restrictions on either understanding or carrying our short, simple instructions, or with respect to interacting appropriately with the public, supervisors, and/or co-workers; slight restrictions on making judgments on simple work-related decisions and responding appropriately to changes in a routine work setting; and moderate limitations on understanding, remembering,

and carrying out detailed instructions, as well as responding appropriately to work pressures in a usual work setting. (R. at 301). Dr. Uran did not assess Plaintiff as having any marked or severe restrictions. (*Id.*).

5.    Dr. Vigna's June 10, 2010 Mental Residual Functional Capacity

On June 10, 2010, Dr. John Vigna, Psy.D., a state-agency psychologist, completed a Mental Residual Functional Capacity Assessment. (R. at 303–06). In completing this Assessment, Dr. Vigna reviewed Plaintiff's file, which consisted of medical reports from Drs. Drolet and Uran.[10] (R. at 305–06). Based on his review of the file, Dr. Vigna concluded that the medical evidence established that Plaintiff suffered from multiple medically determinable impairments, including: Depressive Disorder NOS; Major Depressive Disorder; Panic Disorder without Agoraphobia; Social Phobia; and Posttraumatic Stress Disorder. (R. at 305).

With respect to Plaintiff's functional capacity, Dr. Vigna opined that Plaintiff was capable of performing "simple, routine, repetitive work in a stable environment." (*Id.*). However, stress exacerbated his symptoms. (*Id.*). Plaintiff was able to ask simple questions, accept simple instructions, sustain an ordinary routine without special supervision, and perform repetitive work without constant supervision. (*Id.*). Overall, Dr. Vigna concluded that Plaintiff's limitations did not preclude him from meeting the basic mental demands of competitive work on a sustained basis. (*Id.*).

Dr. Vigna averred that Plaintiff's statements were partially credible, based on the evidence of record. (R. at 205). Similarly, Dr. Vigna found Dr. Drolet's opinions as to Plaintiff's

---

[10] The Mental RFC Assessment does not further specify what specific reports were reviewed; the Assessment references reports based on the date Dr. Vigna received them, rather than the dates on which the medical reports were prepared. (R. at 305–06).

functional capacity only partially credible in light of inconsistencies between her report and other evidence, as well as her heavy reliance on Plaintiff's subjective complaints of symptoms and limitations. (*Id.*). By contrast, Dr. Vigna found Dr. Uran's report on Plaintiff's abilities to make occupational adjustments, make performance adjustments, make personal and social adjustments, and perform other work-related activities to be consistent with the other medical evidence, and therefore, accorded her opinion great weight. (R. at 305–06).

      6.    Dr. Vigna's June 16, 2010 Psychiatric Review Technique

Dr. Vigna also performed a Psychiatric Review Technique on June 16, 2010. (R. at 207–20). Therein, he opined that Plaintiff has mild limitations on his activities of daily living; moderate limitations with respect to social functioning; concentration; and no limitation on repeated episodes of decompensation. (R. at 317).

**E.    Administrative Hearing**

An administrative hearing regarding Plaintiff's application for DIB was held on August 10, 2011 in Mars, Pennsylvania before ALJ Brian W. Wood. (R. at 24, 33–62). Plaintiff appeared and testified with his attorney, Elizabeth A. Smith, Esq. (*Id.*). Patricia J. Murphy,[11] an impartial vocational expert ("the VE"), also testified. (*Id.*).

Plaintiff testified that he lived with his wife and their two sons, who were nineteen and twenty years old. (R. at 37). The family relied on his wife's income to pay household expenses. (R. at 38). Plaintiff reported that he had a driver's license and drove several times per week, usually to his doctor's. (*Id.*). He last worked in June 2009, explaining that he stopped working

---

[11] Ms. Murphy earned her Bachelor of Arts from Youngstown State University, and her Master of Education degree from Kent State University. (R. at 88). She is certified as a Rehabilitation Counselor and Transitional Work Program Developer in Ohio. (*Id.*). Ms. Murphy is presently employed as a Case Manager and Vocational Expert at Murphy Vocational Services, LLC. (*Id.*).

because he experienced "severe depression about four or five times a week," in addition to suffering panic attacks during the night and in crowded areas. (R. at 38, 41). Although Plaintiff previously had some impairments in his shoulder and wrist around 1996, he said that those physical issues had not caused him to stop working. (R. at 41).

Regarding Plaintiff's mental capabilities, Plaintiff testified that he experiences episodes of depression four to five times each week. (*Id.*). During these episodes, Plaintiff sleeps for most of the day. (R. at 42). Additionally, Plaintiff stated that he suffers from panic attacks about two to three times per week. (R. at 43). Although each attack lasts roughly five to twenty minutes, depending on its severity, afterwards Plaintiff feels "like I ran a marathon, . . . they usually just wipe me out." (R. at 44). He stated that his medication helps "keep [him] on an even keel," and that his mental health has improved from treatment. (R. at 45).

Plaintiff described how his depression and anxiety affect him on "bad days" versus on "good days." (R. at 45–48). On his good days, Plaintiff said that he does household chores, such as cleaning, shopping, and cooking. (*Id.*). He sometimes rides his motorcycle—although because "you need 110 percent to ride a motorcycle," Plaintiff "hardly ever" rides anymore. (R. at 49). On bad days, Plaintiff is not able to complete household tasks, and his wife does the cooking. (R. at 47). Plaintiff further explained that his anxiety often worsens in social situations or when he is around a crowd of people, and he worries about experiencing panic attacks in such scenarios. (R. at 47–48). Consequently, he prefers to go with his wife or sons—rather than alone—when he shops or eats in restaurants. (*Id.*).

With respect to work, Plaintiff testified that he has tried to obtain new employment, including submitting "numerous amounts of applications" and going on interviews, but he has not received callbacks. (R. at 50). On this point, Plaintiff said that he often gets nervous during

19

interviews. (*Id.*). He has thought about returning to school. (R. at 51). Plaintiff averred that if he was employed, he would probably "be taking off more than I would be there," because of his depression and anxiety. (*Id.*).

After the ALJ questioned Plaintiff, his attorney, Ms. Smith, examined him. (R. at 52–56). In response to Ms. Smith's questions, Plaintiff testified that he left his job at Traco because of his worsening anxiety. (R. at 52). Prior to his 2009, Plaintiff's mental health did not interfere with his work. (R. at 53). For example, although Plaintiff had taken time off work around 2007— because of his wife's health issues—he stated that his attendance otherwise was good during the twenty-five years he worked at Traco. (*Id.*). Plaintiff began having problems at work due to his anxiety in January 2009. (*Id.*). In February of that year, the attacks became more frequent. (*Id.*). "Trying to do [his] job on a day-to-day basis was getting harder and harder." (*Id.*). He sometimes left work early after experiencing a panic attack during the workday. (*Id.*). Some days, he had panic attacks in the morning, and missed an entire workday. (*Id.*). Additionally, Plaintiff described that in the last six months he worked at Traco, he felt like his supervisors were accusing him of things and he felt like he was "walking on pins and needles" around his co-workers, in that he was "always afraid of getting a panic attack." (R. at 53).

Regarding his daily activities, Plaintiff testified that his ability to sustain attention varies. (R. at 54). For example, if he is having a good day, he is able to pay attention to an entire hour-long television show, but on bad days he usually just sleeps. (*Id.*). He also reported increased anxiety when his wife gives him a list of things to do, explaining that he feels like he needs to complete the tasks within a short period of time. (*Id.*). However, if Plaintiff does not have a panic attack, he averred that he is usually able to complete his list. (R. at 55). He stated this his anxiety increases in crowded places, and that crowds sometimes cause his panic attacks. (*Id.*). Following

a panic attack, Plaintiff usually sleeps for the rest of the day. (R. at 55–56). Additionally, Plaintiff stated that Ativan causes him to feel drowsy, and Klonopin sometimes causes drowsiness, as well. (R. at 56).

Following Ms. Smith's questioning, the ALJ re-examined Plaintiff. (R. at 56–58). Pursuant to these questions, Plaintiff testified that towards the end of his time working at Traco, he was moved from a quality control job to a line leader position due to downsizing within the company. (R. at 56–57).

Next, the ALJ examined the VE. (R. at 58–61). The VE testified that, based upon her review of Plaintiff's record and his testimony at the hearing, his work history includes three different jobs: (1) an offbearer, which is unskilled and medium exertion level; (2) quality control technician, which is skilled and medium to heavy exertion based on Plaintiff's description, but is classified by the DOT as light; and (3) line leader or assembly supervisor, which is skilled and light. (R. at 59–60). The ALJ asked the VE about a hypothetical individual with Plaintiff's age, education, and work experience, no exertional limitations, but the following restrictions: no exposure to hazards, such as heights and moving machinery; limited to simple, routine, repetitive tasks; requiring low-stress work, defined as occasional simple decision-making; requires only occasional changes in the work setting; unable to perform work in a fast-paced production environment; only occasional interaction with co-workers and supervisors; and no interaction with the public. (R. at 60). The VE testified that this individual would not be able to perform any of Plaintiff's past relevant work. (*Id.*). However, the VE testified that this individual would be able to perform a number of jobs in the national economy, including cleaner, which is medium exertion and for which there are 260,000 jobs in the national economy; linen room attendant, which is medium exertion and for which there are 960,000 jobs in the national economy; and

routing clerk, which is light exertion and for which there are 87,000 jobs in the national economy. (R. at 60–61). If the individual was off-task more than twenty percent of the workday, or if the individual missed more than two days of work per month, the VE testified that no work would be available. (*Id.*).

Finally, Ms. Smith examined the VE. (R. at 61–62). She asked whether jobs exist if the hypothetical person described by the ALJ had difficulty accepting changes to what he was doing in the work setting. (R. at 61). The VE testified that there would not be jobs for the individual in that circumstance. (R. at 62).

## IV. STANDARD OF REVIEW

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004); *Brewster v. Heckler*, 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work,

whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005); *Barnhart v. Thomas*, 540 U.S. 20, 24–25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g),[12] 1383(c)(3);[13] *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. § 706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Hagans*, 694 F.3d at 292.

---

[12] Section 405(g) provides in pertinent part:
> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business.

42 U.S.C. § 405(g).

[13] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

Substantial evidence is "more than a mere scintilla but may be less than a preponderance." *Id.* at 292 (quoting *Plummer v. Apfel*, 186 F. 3d 422, 427 (3d Cir. 1999)); *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545 (3d Cir. 2003). It means "such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Newell*, 347 F.3d at 545 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Davis v. Astrue*, 830 F. Supp.2d 31, 34 (W.D. Pa. 2011). When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Gamret v. Colvin*, 2014 WL 109089 at *1 (W.D. Pa. Jan. 10, 2014) (citing *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947)). The court will not affirm a determination by substituting what it considers a proper basis. *Chenery*, 332 U.S. at 196–97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Albert Einstein Med. Ctr. v. Sebelius*, 566 F.3d 368, 373 (3d Cir. 2009) (quoting *Monsour Med. Ctr. v. Heckler*, 806 F. 2d 1185, 1190–91 (3d Cir. 1986)).

## V.    DISCUSSION

In his September 14, 2011 decision, the ALJ determined that Plaintiff satisfied Step One because he had not engaged in substantial gainful activity since the alleged onset date. (20 C.F.R. §§ 404.1520(c), 416.920(c)). (R. at 20). At Step Two, the ALJ found that Plaintiff had severe

impairments including: major depressive disorder; anxiety disorder with panic attacks; social phobia; and post-traumatic stress disorder. (*Id.*). (20 C.F.R. §§ 404.1520(c), 416.920(c)). These impairments did not meet one of the listings under the Act, either individually or in combination, and so the analysis proceeded beyond Step Three. (R. at 20–22). For the remaining steps, and after considering evidence from the Record, the ALJ assessed Plaintiff's RFC as follows:

> [Plaintiff has the RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can have no exposure to hazards such as heights and moving machinery; he is able to perform simple, routine, repetitive tasks; he requires low stress work defined as occasional simple decision-making and occasional changes in the work setting; he cannot perform work in a fast-paced production environment; he can have occasional interaction with co-workers and supervisors; and he can have no interaction with the public.

(R. at 22). Nevertheless, based upon the testimony of the vocational expert, the ALJ found that Plaintiff would be capable of engaging in substantial gainful activity in a variety of jobs existing in significant numbers in the national economy. (R. at 27–28). Therefore, the ALJ concluded that Plaintiff was not under a disability within the Act from June 9, 2009 through the date of his decision. (R. at 28).

In his Motion for Summary Judgment (Docket No. 10), supporting Memorandum (Docket No. 11), and Reply Brief (Docket No. 15), Plaintiff argues that the ALJ erred in: (1) failing to accord appropriate weight to the opinion of Dr. Drolet; (2) improperly assessing Plaintiff's credibility; and (3) relying on a deficient hypothetical question that did not fully reflect Plaintiff's limitations. (*See, e.g.*, Docket No. 11 at 1). Defendant counters that the ALJ's decision was properly supported by substantial evidence, and should be affirmed. (Docket No. 13). For the reasons set forth herein, the Court agrees with Defendant.

## A. Dr. Drolet's Opinions

Plaintiff's initial argument is that the ALJ failed to give sufficient weight to the opinions of Dr. Drolet, a treating provider. (Docket No. 11 at 2–8; Docket No. 15 at 1–4). Given that Dr. Drolet met with Plaintiff for hour-long sessions on at least thirty-six occasions prior to her July 2011 Source Statement,[14] Plaintiff contends that Dr. Drolet had gained a "longitudinal perspective of [Plaintiff's] condition." (Docket No. 11 at 5). Thus, Plaintiff asserts, Dr. Drolet's opinions warrant greater weight than the ALJ afforded. (*Id.*).

Plaintiff is correct in stating that the opinions of treating physicians are generally entitled to substantial and possibly controlling weight. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 201–02 (3d Cir. 2008); *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001); S.S.R. 96-5P, 1996 WL 374183, at *4. In order to be accorded greater weight, however, the treating physician's opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). The ALJ is entitled to weigh all of the evidence in the record and may assign a non-treating physician's opinion greater weight if that decision is supported by the record evidence. *Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011). In weighing relevant medical evidence, the ALJ may choose which opinions to accord greater weight, but may not reject or ignore evidence in the record without providing a rationale. *Id.* (citing *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)). The opinion of a treating physician may be rejected outright only on the ground of contradictory medical evidence. *Id.*

---

[14] *See supra*, § III.D.2–3, detailing the two Provider Source Statements that Dr. Drolet provided.

Here, the ALJ considered Dr. Drolet's opinions and provided a rationale for his decision to give them little weight. (R. at 25–26). The record supports the ALJ's finding that Dr. Drolet's opinions are inconsistent with the findings of Drs. Matta, Houk, Uran, and Vigna. (R. at 23–26). To this end, in her April 2, 2010 and July 10, 20100 Source Statements, Dr. Drolet assessed Plaintiff with more severe functional restrictions than did the consulting examiners. (R. at 292–94, 611–15). For example, Dr. Drolet averred that Plaintiff's prognosis is "fair to poor." (R. at 613). By contrast, Dr. Houk determined that Plaintiff has a "modest vocational potential," (R. at 626). Dr. Drolet assessed Plaintiff's abilities as fair or poor with respect to performing many work-related activities, such as working in proximity to others, behaving in a socially appropriate manner, responding to changes in the work setting, and getting along with other people. (R. at 613–15). Dr. Uran, however, opined that Plaintiff required no restrictions in carrying out short, simple instructions or interacting appropriately with other people, and Plaintiff needed only slight restrictions for responding appropriately to workplace changes. (R. at 301). Similarly, Dr. Vigna concluded that Plaintiff was capable of asking simple questions, accepting simple instructions, and performing repetitive work without constant supervision, and was thus able to meet the basic mental demands of competitive work on a sustained basis. (R. at 305). The ALJ is entitled to weigh the record evidence in determining the weight to grant the opinion of a treating physician. *Brown*, 649 F.3d at 196. Based on the discrepancies between Dr. Drolet's opinions and the remainder of the record, the ALJ did not err by finding that her opinions were inconsistent with the totality of the evidence. *Id.*

Plaintiff further argues that the ALJ erred by apparently giving weight to Dr. Vigna's opinion, noting that Dr. Vigna had not reviewed all of Dr. Drolet's treatment notes at the time he formulated his report. (Docket No. 11 at 5–6). "[W]hen a state agency physician renders an RFC

assessment prior to a hearing, the ALJ may rely on the RFC if it is supported by the record as a whole, including evidence that accrued after the assessment." *Smith v. Astrue*, 961 F. Supp. 2d 620, 644 (D. Del. 2013). In this case, although Dr. Vigna was not privy to the entire record of evidence from Dr. Drolet (in that some of her notes reflect treatment that was provided after his review), the ALJ accorded "significant weight" to Dr. Vigna's opinions because the ALJ found them consistent with evidence from Drs. Houk and Uran. (R. at 24). The Third Circuit addressed this issue in *Chandler v. Commissioner*, noting that "because state agency review precedes ALJ review, these is always some time lapse between the consultant's report and the ALJ hearing and decision." 667 F.3d 356, 361 (3d Cir. 2011). Despite this time lapse, an ALJ may still consider the consultant's opinion in formulating the RFC. *Id.* That the ALJ here had discretion to decide, based on the record, how much weight to give Dr. Vigna's opinion is further supported because the records do not indicate that Plaintiff's status changed markedly after Dr. Vigna's evaluation in June 2010. *See Smith*, 961 F. Supp. 2d at 644–45 ("Most importantly, none of the events that occurred between June 2007 and June 2008 would be likely to have altered Dr. Borek's conclusions. Dr. Borek's assessment cited to and hinged upon Smith's own treating physicians' medical records, to the extent those records commented on Smith's physical abilities. None of Smith's doctors who treated him in late 2007 and early 2008 (after the issuance of Dr. Borek's opinion) . . . recommended that Smith limit his physical activity."). The ALJ, accordingly, did not err in giving significant weight to Dr. Vigna's assessment.

Plaintiff also contends that the ALJ incorrectly found that Dr. Drolet's opinion overestimated the severity of Plaintiff's functional restrictions. (Docket No. 11 at 5–6). In support of this argument, Plaintiff points to treatment notes from Plaintiff's therapy sessions with Dr. Drolet which reflect Plaintiff's ongoing anxiety and depression, avoiding crowds, changes in

mood, and uncertainty about whether he can maintain a job. (*Id.* at 6). Plaintiff further points out that all of the medical providers—including those to whom the ALJ accorded greater weight—opined that Plaintiff has some degree of functional limitation and diagnosed Plaintiff with depression and anxiety. (Docket No. 11 at 5–7). To start, "[t]he opinion of a treating physician does not bind the ALJ on the issue of functional capacity." *Chandler v. Comm'r of Soc. Sec.*, 667 F. 3d 356, 361 (3d Cir. 2011) (quoting *Brown v. Astrue*, 649 F. 3d 193, 197 n.2 (3d Cir. 2011)). In this Court's estimation, however, the ALJ accommodated the credibly established limitations. (R. at 22–26). The RFC limits Plaintiff to simple, routine, repetitive tasks, low-stress work (meaning simple decision-making and only occasional work-setting changes), no fast-paced production environments, only occasional interaction with co-workers or supervisors, and no interaction with the public. (R. at 22). Although Dr. Drolet's Source Statements indicated that Plaintiff had restrictions beyond this RFC, limitations that are in conflict with the medical record are not required to be included in a RFC formulation. *Lynn v. Colvin*, 2013 WL 3854460, *14 (W.D. Pa. July 24, 2013) (citing *Rutherford v. Barnhart*, 399 F. 3d 546, 554 (3d Cir. 2005)). Therefore, the Court finds that the ALJ did not err in finding Dr. Drolet's opinions incredible to the extent that they conflicted with the preponderance of the record evidence.

### B.    Plaintiff's Credibility

Next, Plaintiff argues that, in formulating his RFC, the ALJ did not properly consider Plaintiff's complaints regarding medication side effects and his "sporadic" ability to perform activities. (Docket No. 11 at 9–11; Docket No. 15 at 4–5). With respect to medication side effects, the ALJ noted that Plaintiff indicated during the hearing as well as on a medication report form that he experiences side effects from Ativan and Klonopin, and that Dr. Drolet similarly indicated in one of her Source Statements that Ativan causes Plaintiff to feel drowsy.

(R. at 24–25). However, the ALJ gave these reports limited weight because they are contradicted by the evidence provided from Drs. Fiorina and Matta, whose treatment notes consistently state that Plaintiff reported no side effects. (R. at 24). The ALJ additionally accommodated Plaintiff's complaint of side effects by limiting him to simple, routine, repetitive tasks. (R. at 22, 24). Given this record, the ALJ's decision not to accord significant weight to Plaintiff's statements concerning the medication side effects was supported by substantial evidence.

Regarding Plaintiff's abilities to engage in activities, the ALJ found that Plaintiff has "good activities of daily living," works on his motorcycle, has been looking for work, fills out a journal daily, goes shopping with his family, does lawn work, and works around the house. (R. at 24–25). The ALJ further considered Plaintiff's complaints that his functioning fluctuates between good and bad days, and that on bad days he is not able to do anything except lay around the house and sleep. (R. at 25). The ALJ determined that Plaintiff's mental health impairments cause some functional limitations, but that these symptoms were not so disabling that he is unable to work within the RFC. (R. at 25–26). Although Plaintiff argues that the ALJ cherry-picked the journal entries,[15] selectively citing to entries to support the ultimate conclusion that Plaintiff is not disabled, (Docket No. 11 at 9–10), the Court finds no error. The simple fact that the ALJ did not explicitly discuss every subjective claim made by Plaintiff, alone, is not dispositive. "A written evaluation of every piece of evidence is not required," and "the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it." *Phillips v. Barnhart*, 91 F. App'x 775, 780 n.7 (3d Cir. 2004) (citations omitted). The ALJ discussed Plaintiff's subjective complaints, indicating that he gave consideration to same. *See*

---

[15] As this Court has noted, the Record contains several hundred pages of Plaintiff's journal entries. (R. at 170–264; 321–559).

*Johnson v. Commissioner*, 529 F.3d 198, 203–04 (3d Cir. 2008) (citing *Burnett v. Comm'r*, 220 F.3d 121, 121 (3d Cir. 2000); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)). Given the record evidence contradicting Plaintiff's subjective account of the severity of his limitations, the ALJ's determination as to Plaintiff's credibility was not in error. *Id.* at 204 ("To the extent that Dr. Hunter's fine manipulation testimony speaks to a relevant time period, the ALJ was still entitled to reject it without explanation. Overwhelming evidence in the record discounted its probative value, rendering it irrelevant.").

Plaintiff finds error in the ALJ's statement that Plaintiff's panic attacks were "under control." (Docket No. 15 at 5). The Court observes that the ALJ recognized that Plaintiff experienced ongoing mental health impairments and accounted for same through the RFC's restrictions. (R. at 25). Similarly, Plaintiff's arguments that his activities were so sporadic or intermittent that, under Third Circuit case law, the ALJ should have found disability are unpersuasive. (Docket No. 11 at 11). Plaintiff cites to *Ramos v. Barnhart*, 513 F. Supp. 2d 249, 259 (E.D. Pa. 2007), among other cases from outside this circuit, which in turn cite to *Smith v. Califano*, 637 F.2d 968 (3d Cir. 1981). In *Smith*, the Court of Appeals for the Third Circuit found that an ALJ improperly relied on activities in which the claimant intermittently engaged, because the finding that these sporadic activities disproved disability was "too speculative." 637 F.2d at 971–72. In that case, however, the court pointed out that the claimant's activities were "miniscule," and that the ALJ's error was "compounded by the absence of corroborating medical testimony. Such evidence is essential to a finding of non-disability." *Id.* By contrast, Plaintiff concedes that on good days, "[t]here is no question that [he] is able to perform activities." (Docket No. 11 at 11). The record further indicates that, despite his continuing bad days, Plaintiff was actively looking for work, which the ALJ considered in determining that Plaintiff's

statements as to the severity of his restrictions were not wholly credible. (R. at 576, 580, 585, 587, 589–91, 594, 598, 600, 602, 604). Moreover, as the ALJ recognized, the record here contains medical testimony from Dr. Houk and Dr. Vigna that Plaintiff is capable of sustaining employment. (R. at 303–06, 626). The ALJ further took account of Plaintiff's assertions that his activity level changes based on good days and bad days, adding restrictions in the RFC based on circumstances that tend to trigger Plaintiff's symptoms, such as crowds and stress. (R. at 23). Therefore, the ALJ's determination that Plaintiff is able to work within the RFC capacity is supported by substantial evidence.

### C.     The ALJ's Hypothetical

Finally, Plaintiff argues that the hypothetical presented by the ALJ to the vocational expert failed to reflect all of Plaintiff's limitations in concentration, persistence, and pace. (Docket No. 11 at 12–13). The ALJ found that Plaintiff has moderate difficulties with respect to concentration, persistence, or pace. (R. at 21).

Plaintiff's argument lacks merit. The ALJ's hypothetical and RFC include multiple restrictions to accommodate this limitation. To that end, the RFC limits Plaintiff to: (1) simple, routine, repetitive tasks; (2) low stress work, which is defined as occasional simple decision-making and occasional changes in the work setting; and (3) work outside of a fast-paced production environment. (R. at 22, 60). Such restrictions have repeatedly been found sufficient to accommodate limitations in concentration, persistence, and pace. *See, e.g.*, *Menkes v. Astrue*, 262 F. App'x. 410, 412 (3d Cir. 2008) ("The term 'simple routine tasks,' in the context of the disability proceedings, generally refers to the non-exertional or mental aspects of work. For example, performing a 'simple routine task' typically involves low stress level work that does not require maintaining sustained concentration. . . . Having previously acknowledged that

32

Menkes suffered moderate limitations in concentration, persistence and pace, the ALJ also accounted for these mental limitations in the hypothetical question by restricting the type of work to 'simple routine tasks.'"); *Polardino v. Colvin*, Civ. No. 12-806, 2013 WL 4498981, *3 (W.D. Pa. Aug. 19, 2013) ("The Third Circuit Court of Appeals has determined that a limitation to simple, routine tasks sufficiently accounts for a claimant's moderate limitations in concentration, persistence and pace."); *Hart v. Colvin*, Civ. No. 13-5, 2013 WL 4786061, *9 (W.D. Pa. Sept. 6, 2013) ("Hart's concentration-related difficulties were accommodated by the limitations permitting the performance of only simple, routine, repetitive tasks."); *Bradley v. Astrue*, Civ. No. 08-204J, 2009 WL 2338114, *4 (W.D. Pa. July 29, 2009) ("[T]he court notes initially that the ALJ's residual functional capacity finding in fact does account for plaintiff's attention and concentration deficits by limiting plaintiff to 'simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions and, in general, relatively few work place changes.'"). The Court, thus, finds that the ALJ's hypothetical was not in error, and no additional RFC restriction was necessary to accommodate Plaintiff's concentration impairments.

## VI.    CONCLUSION

Based on the foregoing, Plaintiff's Motion for Summary Judgment [10] is DENIED, and Defendant's Motion for Summary Judgment [12] is GRANTED.

*/s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: April 8, 2014
cc/ecf: All counsel of record.